IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ACHIQUE COYASO, | ) | CIVIL NO. 11-00267 JMS/RLP |
| | ) | |
| Plaintiff, | ) | ORDER (1) GRANTING IN PART |
| | ) | DEFENDANT BRADLEY PACIFIC |
| vs. | ) | AVIATION, INC.'S MOTION FOR |
| | ) | SUMMARY JUDGMENT; AND |
| BRADLEY PACIFIC AVIATION, | ) | (2) DECLINING JURISDICTION |
| INC., | ) | OVER REMAINING STATE LAW |
| | ) | CLAIM |
| Defendant. | ) | |
| _____ | ) | |

## ORDER (1) GRANTING IN PART DEFENDANT BRADLEY PACIFIC AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT; AND (2) DECLINING JURISDICTION OVER REMAINING STATE LAW CLAIM

## I.  INTRODUCTION

On April 21, 2011, Plaintiff Achique Coyaso ("Plaintiff") filed this

action alleging that his termination from Defendant Bradley Pacific Aviation, Inc.

("Defendant") violated (1) the Uniformed Services Employment and

Reemployment Rights Act (the "USERRA"), 38 U.S.C. § 4311 et seq.; (2) Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.;

(3) Hawaii's anti-discrimination statute, Hawaii Revised Statutes ("HRS") § 378-2;

and (4) the Hawaii Whistleblower's Protection Act (the "HWPA"), HRS § 378-61.

Currently before the court is Defendant's Motion for Summary

Judgment, arguing, among other things, that Plaintiff's USERRA and Title VII

claims fail because Defendant legitimately terminated Plaintiff for violating

Defendant's workplace policies based upon his involvement in a violent altercation

with a woman twenty feet from Defendant's office.  Based on the following, the

court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's

USERRA, Title VII, and HRS § 378-2 claims, and declines jurisdiction over

Plaintiff's remaining state law claim.

## II. <u>BACKGROUND</u>

### A.      **Factual Background**

Defendant is in the business of refueling aircrafts at airports in

Hawaii.  Doc. No. 54, Def.'s Concise Statement of Facts ("CSF") ¶ 1.[1]  Plaintiff

worked for Defendant as a refueler at Lihue International Airport from October 9,

2008 through January 18, 2011, *id.* ¶¶ 1-2, with a break from September 9, 2009

through August 2010 when Plaintiff was deployed to Kuwait with the United

States Army.  Plaintiff's pre-deployment employment was not without controversy

-- Plaintiff was repeatedly counseled and disciplined for violations of Defendant's

policies, *id.* ¶ 3, and was also involved in a number of events that form the basis of

---

[1]  Where the parties do not dispute a particular fact, the court cites directly to Defendant's CSF.  The court further recites only those facts relevant to the claims addressed in this Order.

his claims against Defendant. Plaintiff was ultimately terminated after he returned from his deployment and was involved in a violent altercation with a woman near Defendant's workplace. The court outlines these events as follows:

### 1. *Events Prior to Plaintiff's Deployment*

On March 15, 2009, Plaintiff applied for the position of Operations Supervisor. Doc. No. 64-2, Pl.'s Decl. ¶ 16; Doc. No. 64-9, Pl.'s Ex. 6 (application). After applying for this position, Defendant's Honolulu office pulled Plaintiff's time-keeping records, which resulted in Plaintiff receiving a March 29, 2009 written warning for excessive tardiness. Doc. No. 64-2, Pl.'s Decl. ¶ 17; Doc. No. 64-10, Pl.'s Ex. 7. In a written response to the warning, Plaintiff explained that although he always notified his fellow employees when he is running late to work, he agreed that his attendance is unsatisfactory and that he "will take corrective actions to fix these shortcomings to prevent any future downfalls." Doc. No. 64-10, Pl.'s Ex. 7.

On April 13, 2009, Plaintiff learned that Kevin Reis, a Caucasian, was selected for the Operations Supervisor position. Doc. No. 64-2, Pl.'s Decl. ¶ 18; Doc. No. 64-11, Pl.'s Ex. 8; *see also* Doc. No. 54, Def.'s CSF ¶ 5. At the time, Plaintiff felt discriminated against because he believed that he was more qualified than Reis -- Plaintiff had more experience in a supervisory position and

more years operating a commercial vehicle carrying hazardous materials. Doc. No. 64-2, Pl.'s Decl. ¶ 19; *see also* Doc. No. 54, Def.'s CSF ¶ 6. Plaintiff did not file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") until May 2, 2011, *see* Doc. No. 54, Def.'s CSF ¶ 7, however, because a general meeting was being organized to address employees' concerns, Plaintiff wanted to speak to military legal advisors, and military obligations delayed him. Doc. No. 54-2, Def.'s Ex. A at 221-22.

This general meeting was held on May 27, 2009 by Defendant's general manager, Shaen Tarter. At the meeting, Plaintiff asked what was going to be done to end workplace discrimination. Doc. No. 54, Def.'s CSF ¶ 10. Plaintiff raised this concern because several employees felt that they were discriminated against on the basis of race and they wanted to speak to Tarter as a group. Doc. No. 54-2, Def.'s Ex. A at 209-14; *see also* Doc. No. 64-2, Pl.'s Decl. ¶ 23. According to Plaintiff, there were other instances of Caucasians receiving preferential treatment and/or non-Caucasians receiving lesser treatment, including when (1) John Lujon, a Caucasian, was appointed to a supervisory position without any job announcement; (2) Caucasians received favorable schedules compared to non-Caucasians who were forced to work nights and/or weekends; and (3) Debra

Mata was demoted from Station Manager to Officer Supervisor with less pay.[2] Doc. No. 64-2, Pl.'s Decl. ¶¶ 20-22; Doc. No. 64-12, Pl.'s Ex. 9. Tarter responded that Defendant abided by the law and that claims of discrimination were serious and should not be used lightly such that Plaintiff should provide a written description of any specific instances of discrimination. Doc. No. 54-2, Def.'s Ex. A at 209-14; Doc. No. 54-17, Def.'s Ex. C at 67; *see also* Doc. No. 64-2, Pl.'s Decl. ¶ 24 (asserting that Tarter told Plaintiff that "if someone did throw [the word discrimination] around lightly, then there would be consequences").

After this general meeting, Plaintiff continued to have problems with Defendant's management. On June 4, 2009, Plaintiff was counseled about the need to stay current with his training, and also received a warning for obtaining a work replacement who was not trained on the relevant airplanes and without receiving approval from his supervisor. Doc. No. 54-2, Def.'s Ex. A at 191-92; *see also* Doc. Nos. 54-5, 54-6, Def.'s Exs. 3, 4. Plaintiff conceded that both the warning and counseling were warranted. Doc. No. 54-2, Def.'s Ex. A at 192, 194. On June 5, 2009, Plaintiff was suspended for two days for failing to report to work,

---

[2] Plaintiff also puts forth evidence that in January 2010, employee David Miyasato was terminated after he failed to wear a hard hat and locked the dead man's handle while filling a truck at a Tesoro station. Doc. No. 64-3, Miyasato Decl. ¶ 7. Miyasato asserts that the fuel operations supervisor, Daniel Patterson, placed negative comments on his employee evaluation that were previously not there, and that his termination was discriminatory. *Id.* ¶¶ 10-13.

*id.* at 198-99, Doc. No. 54-4, Def.'s Ex. 2, which Plaintiff asserted was unfair because the schedule was confusing and often changed.  Doc. No. 54-2, Def.'s Ex. A at 199-201.

The last incident before Plaintiff's deployment involved an August 12, 2009 written warning for an alleged failure to use a Status Change Form to document that Plaintiff would not be able to work the weekend of August 8-9, 2009 due to military duty and would need the following Monday and Tuesday off to recover from jetlag.  Doc. No. 64-15, Pl.'s Ex. 12.  The warning further explains that his request for Monday and Tuesday off was a change in routine days off and impacted scheduling, and that Plaintiff must provide official orders for military duty and the contact number for his unit and Commander.  *Id.*  In his written rebuttal to this warning, Plaintiff asserted that (1) he timely provided a Status Change Form to his direct supervisor, Kevin Reis; (2) Mondays and Tuesdays were his usual days off (even though he had been scheduled to work those particular dates), and Reis agreed that Plaintiff could take these dates off; (3) Reis has repeatedly lost his Status Change Forms; and (4) Plaintiff is willing to provide military orders when he receives them, as well as his military supervisor's contact information.  Doc. No. 54-16, Pl.'s Ex. 13; *see also* Doc. No. 54-2, Def.'s Ex. A at 280-83 (explaining that Plaintiff did not believe that Defendant required evidence

substantiating his military duty and he wanted to safeguard his commanding officer's information).

## 2. Plaintiff's Deployment and the August 2, 2010 Incident

In September 2009, Plaintiff was mobilized for deployment to Kuwait, leaving his employment with Defendant on September 9, 2009. Doc. Nos. 54-20, 54-26, Pl.'s Exs. 17, 23. Although Plaintiff's deployment was scheduled to end in October 2010, Doc. No. 64-20, Pl.'s Ex. 17, Plaintiff was discharged from active duty on May 31, 2010.[3] Doc. No. 54, Def.'s CSF ¶ 13.

Plaintiff returned from his deployment in late May 2010 and applied for reinstatement with Defendant in late August 2010. *Id.* ¶¶ 13-15. Defendant reinstated Plaintiff, but immediately placed him on paid administrative leave pending investigation into an August 2, 2010 altercation Plaintiff had with a female employee of AirVentures, an airplane tour company with customer facilities twenty feet from Defendant's offices at Lihue International Airport. *See* Doc. No. 54, Def.'s CSF ¶¶ 17, 20; Doc. No. 54-2, Def.'s Ex. A at 139-40, Doc. No. 54-16, Def.'s Ex. B at 161.

At the time of the incident, Plaintiff was engaged to AirVenture's co-owner, Donna Diano, and on August 2, 2010, he accompanied Diano to the

---

[3] Plaintiff was released from active duty after receiving psychiatric counseling and being processed out of Kuwait. Doc. No. 54-2, Def.'s Ex. A at 86-88, 100-08.

AirVentures office to pick up payroll information and other documents. Doc. No. 54-2, Def.'s Ex. A at 42-43, 346. Due to previous altercations Diano had with her ex-husband (who was the other co-owner of AirVentures), Plaintiff videotaped Diano as she entered the building. *Id.* at 346-49. The videotape shows (1) Diano walk to an AirVentures desk, search through a drawer, take out some files, and review their contents; (2) AirVentures employee Ingrid Wehner confront Diano about taking the files and attempt to grab the files from Diano; and (3) Plaintiff state "Don't touch Donna," and then insert himself between Diano and Wehner. Doc. No. 54-25, Def.'s Ex. 11; *see also* Doc. No. 54-29, Wehner Decl. ¶¶ 7-8; Doc. No. 54-2, Def.'s Ex. A at 350-51. At this point, the videotape stops recording and picks up again after the altercation ended -- it shows Wehner on her cell phone and Diano and Plaintiff leaving the office. Doc. No. 54-25, Def.'s Ex. 11.

As to what happened during the time the videotape did not record, individuals have recited different versions of events. According to Plaintiff's January 24, 2012 deposition testimony, "[I] . . . utilized my body and my arm, along with my hand, to pry myself in between the two women." Doc. No. 54-2, Def.'s Ex. A at 351. Plaintiff asserts that he continued to "block" Wehner as she tried to get around him, and then Wehner eventually settled down and called 911 to report that Plaintiff assaulted her. *Id.* Diano testified during an August 23, 2010

TRO hearing in the Fifth Circuit Court of the State of Hawaii that Plaintiff put his arm between the two women and as Wehner tore part of a folder, Plaintiff stumbled over a chair, causing Wehner to fall. Doc. No. 64-27, Pl.'s Ex. 24 at 116-17, 124-26. Plaintiff and Diano, who maintained possession of the folders the entire time, then stood up and left. *Id.* at 118, 126.

In comparison, Wehner asserts in a February 17, 2012 Declaration that Plaintiff rushed at her and used his shoulder to push her to the floor by a file cabinet. Doc. No. 54-29, Wehner Decl. ¶ 8. As Wehner crouched on the floor, Plaintiff was on top of her trying to rip a file she had gotten from Diano while Diano was trying to pull Plaintiff off Wehner. *Id.* Plaintiff eventually ripped a file from Wehner's hands, walked back to his vehicle, and then for a second time "rushed" Wehner and shoved her to the floor to grab a file she was still gripping. *Id.* ¶ 9. Joel Christopherson, an AirVentures pilot, recites a similar story in his February 21, 2012 Declaration -- he asserts that Plaintiff "bull rushed" Wehner and slammed her into a file cabinet as Christopherson, Diano, and another man tried to pull Plaintiff off Wehner. Doc. No. 54-31, Christopherson Decl. ¶ 8. Plaintiff tore away part of the file and walked back to his vehicle, while Christopherson followed Plaintiff to try to calm him down. *Id.* ¶ 9. Plaintiff then came back to the office, grabbed Wehner's forearm, ripped the remaining file away, and then left

9

with Diano.  *Id.*

Finally, Debra Mata saw the incident from Defendant's office and provided two different versions of what happened.  On the day of the incident, Mata told police that she saw Plaintiff grab Wehner and push and/or tackle her into a filing cabinet twice.  Doc. No. 64-5, Pl.'s Ex. 2.  In her December 19, 2011 deposition, however, Mata testified that she witnessed Plaintiff punch Wehner three to four times in the stomach.  Doc. No. 64-7, Pl.'s Ex. 4 at 138-41; *see also* Doc. No. 54-26, Def.'s Ex. 12.

Despite these differing accounts, it is undisputed that Wehner suffered slight bruising to both forearm areas and abrasion and discoloration to her right rib area, and that Plaintiff was arrested for criminal assault.  Doc. No. 54-26, Def.'s Ex. 14 at 243-45.  On August 23, 2010, the Fifth Circuit Court for the State of Hawaii held an evidentiary hearing and granted Wehner a TRO against Plaintiff.  Doc. No. 54, Def.'s CSF ¶ 19; Doc. No. 54-27, Def.'s Ex. 15.

///

///

///

///

### 3. *Defendant's Investigation*[4]

Upon Plaintiff's request, Defendant reinstated Plaintiff as a full-time Refueler 2, but immediately placed him on paid administrative leave pending investigation into the August 2, 2010 altercation. Doc. No. 54, Def.'s CSF ¶ 20; Doc. No. 54-12, Def.'s Ex. 17.

As part of its investigation, Defendant invited Plaintiff to provide his account of what occurred and to direct Defendant to witnesses who may have relevant information. Doc. No. 54, Def.'s CSF ¶ 21; Doc. No. 54-12, Def.'s Ex. 17. Defendant met with Plaintiff and his attorney, and reviewed Plaintiff's videotape in their presence. *See* Doc. No. 54-22, Def.'s Ex. 19; Doc. No. 54, Def.'s CSF ¶ 22. Plaintiff declined the request to meet with Defendant to explain his side of the story. Instead, his attorney asserted that Wehner was the aggressor and Plaintiff used force only to protect Diano. Doc. No. 54-22, Def.'s Ex. 19. Plaintiff, through this attorney, further refused to address the amount of time that elapsed with respect to the gap in the video and failed to explain how or why

---

[4] The court sets out separately the evidence Defendant collected in its investigation of the August 2, 2010 incident given that the relevant inquiry on Plaintiff's USERRA and Title VII claims is whether there is a genuine issue of material fact that Defendant honestly believed that Plaintiff violated its workplace violence policy. In particular, although Plaintiff now provides his version of the August 2, 2010 incident and Diano testified at the August 23, 2010 TRO hearing regarding the incident, Plaintiff declined to provide his version of events to Defendant, Diano did not provide a statement to Defendant, and Defendant did not receive a copy of the TRO proceedings until February 27, 2012. *See* Doc. No. 67-1, Calvan Decl.

Wehner fell. *Id.* As a result, Defendant concluded that the video did not address whether or to what extent that Plaintiff acted violently.[5] *Id.* at 2.

Defendant also reviewed the police report of the August 2, 2010 incident, interviewed Mata and Christopherson (the two witnesses that the police interviewed), and received a written statement from Mata. In her October 6, 2010 written statement and during a face-to-face interview on January 7, 2011, Mata stated that Plaintiff repeatedly hit a "scrunching" Wehner. Doc. No. 54, Def.'s CSF ¶ 24. Christopherson asserted that Plaintiff "bull rushed" Wehner, knocked her to the ground and ripped away a file, and then returned to go after Wehner a second time. *Id.* ¶ 25. Defendant weighed the evidence and addressed the discrepancy between Christopherson and Mata accounts. *Id.* ¶ 26. Specifically, although Defendant recognized that Mata's observation that Plaintiff punched Wehner was inconsistent with Christopherson's observations, Defendant explained that this difference may be due to Plaintiff attempting to grab the file. Doc. No. 54-22, Def.'s Ex. 19.

Defendant concluded that credible evidence established that Plaintiff was the aggressor, that he acted violently, and that his violence was not justified. Doc. No. 54, Def.'s CSF ¶ 27. Defendant found that this violent behavior violated

---

[5] Plaintiff now explains that he did not want to share information with Defendant out of concern that it would be shared with Wehner. Doc. No. 64-2, Pl.'s Decl. ¶¶ 11-14.

Defendant's "Violence in the Workplace" policy, and Defendant also retained the right to terminate employees who engage in violent conduct. Doc. No. 54-22, Def.'s Ex. 19. As a second reason for termination, Defendant found that Plaintiff "deliberately withheld information . . . and attempted to mislead [Defendant] with respect to important facts," *i.e.*, the gap of time in the video and Plaintiff's assertion that Wehner's injuries were caused by her fall. *Id.* Defendant rationalized that Wehner's fall "corroborates that [Plaintiff] physically assaulted her." *Id.*

On January 18, 2011, Plaintiff was terminated pursuant to the workplace violence policy. Doc. No. 54, Def.'s CSF ¶ 30. Defendant's termination letter explains that termination is appropriate because Plaintiff physically assaulted and injured Wehner without justification and withheld information concerning the length of time covered by the gap in the video tape, which hindered Defendant in gathering pertinent facts. Doc. No. 54-14, Def.'s Ex. 22. Plaintiff understood that workplace violence was a cause for termination, Doc. No. 54, Def.'s CSF ¶ 29, and Plaintiff had described the area where the altercation occurred as the "workplace." *Id.* ¶ 21.

///

///

**B.    Procedural Background**

On April 21, 2011, Plaintiff filed this action.  Plaintiff's Amended

Complaint asserts claims for violations of the USERRA, Title VII, and Hawaii

state law.

On February 22, 2012, Defendant filed its Motion for Summary

Judgment.  Plaintiff filed an Opposition on April 2, 2012, and Defendant filed its

Reply on April 9, 2012.  On April 18, 2012, the court requested Plaintiff to confirm

whether his claims were limited to his termination only and identify the precise

provisions of USERRA at issue.  On April 20, 2012, Plaintiff filed a Statement of

Clarification, asserting that his claims are limited to his termination only (with

other events provided only for context), and that he is asserting violations of 38

U.S.C. §§ 4311 and 4312.  A hearing was held on April 23, 2012.

## III.  <u>STANDARD  OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of*

*Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV. DISCUSSION

Defendant argues that summary judgment should be granted on each of Plaintiff's claims. The court addresses Plaintiff's claims in turn.

### A. USERRA

USERRA is the "latest in a series of laws protecting veterans' employment and reemployment rights going back to the Selective Training and Service Act of 1940." 20 C.F.R. § 1002.2. The purpose of USERRA is to encourage military service "by eliminating or minimizing the disadvantages to civilian careers;" "to minimize the disruption to the lives" of servicemembers and their employers "by providing for the prompt reemployment;" and "to prohibit discrimination" against servicemembers. 38 U.S.C. § 4301(a).

Plaintiff asserts that his termination violates 38 U.S.C. § 4311 and 4312. The court addresses each of these provisions.

## 1.    *38 U.S.C. § 4311*

USERRA's anti-discrimination provision, 38 U.S.C. § 4311(a),

provides:

> A person who is a member of, applies to be a member of,
> performs, has performed, applies to perform, or has an
> obligation to perform service in a uniformed service shall
> not be denied initial employment, reemployment,
> retention in employment, promotion, or any benefit of
> employment by an employer on the basis of that
> membership, application for membership, performance of
> service, application for service, or obligation.

*See also Staub v. Proctor Hosp*., 131 S. Ct. 1186, 1194 (2011) (A defendant is

liable under USERRA when "a supervisor performs an act motivated by

antimilitary animus that is *intended* by the supervisor to cause an adverse

employment action, and . . . that act is a proximate cause of the ultimate

employment action.").  "Although the term 'retaliation' is not used in USERRA,

the gravamen of this section is to prohibit adverse employment actions taken in

retaliation for the exercise of the rights provided by USERRA."  *Wallace v. City of

San Diego*, 479 F.3d 616, 625 n.1 (9th Cir. 2007).

To establish a discrimination claim, § 4311(c)(1) provides that a

violation occurs:

> if the person's membership, application for membership,
> service, application for service, or obligation for service
> in the uniformed services is a motivating factor in the

> employer's action, unless the employer can prove that the
> action would have been taken in the absence of such
> membership, application for membership, service,
> application for service, or obligation for service . . . .

Congress included this language in USERRA after *Monroe v. Standard Oil Co.*,

452 U.S. 549, 559 (1981), held that claims for anti-military employment

discrimination under USERRA's predecessor, the Veterans' Reemployment Rights

Act ("VRRA"), would lie only if the employee could show that the discrimination

was "motivated *solely* by reserve status." (emphasis added).  Congress explained

that *Monroe* "misinterpreted the original legislative intent" of the VRRA, which

was to place "the burden of proof . . . on the employer, once a prima facie case is

established."  H.R. Rep. No. 103-65, at 24 (1994), reprinted in 1994 U.S.C.C.A.N.

2449, 2457.  "[T]he House report [therefore] called for application of the burden-

shifting framework of *NLRB v. Transportation Management Corp.*, 462 U.S. 393

(1983)."  *Velazquez-Garcia v. Horizon Lines Of Puerto Rico, Inc.*, 473 F.3d 11, 16

(1st Cir. 2007) (explaining legislative history of USERRA); *see also Wallace*, 479

F.3d at 624.

Under the burden-shifting framework of *Transportation Management

Corp.*, "the employee first has the burden of showing, by a preponderance of the

evidence, that his or her protected status was 'a substantial or motivating factor in

the adverse [employment] action.'"[6] *Wallace*, 479 F.3d at 624. Military status need not be the sole cause of an adverse action; rather, it must only be "one of the factors that 'a truthful employer would list if asked for the reasons for its decision.'" *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005) (quoting *Brandsasse v. City of Suffolk, Va.*, 72 F. Supp. 2d 608, 617 (E.D. Va. 1999)).

If the employee carries his burden, the burden then shifts to the employer to prove, as an affirmative defense, that it "would have taken the same action without regard to the employee's protected status." *Wallace*, 479 F.3d at 624. Summary judgment is appropriate if the employer "has established as an uncontroverted fact that it would have terminated [the plaintiff's] employment even if he had not been a member of the [military]." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 899 (9th Cir. 2002); *see also To v. U.S. Bancorp*, 651 F.3d 888 (8th

---

[6] In determining motive, the court may consider a number of factors, including:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002) (quotations omitted); *see also Rademacher v. HBE Corp.*, 645 F.3d 1005, 1010-11 (8th Cir. 2011) (listing factors and explaining that motive may be established with direct or circumstantial evidence).

Cir. 2011) (explaining that summary judgment on an USERRA claim "is appropriately granted when an employer's decision to terminate an employee is reasonable as a matter of law"). In other words, an employer must establish "that no reasonable jury could find that [the reason for termination] was a mere pretext of his dismissal." *Velazquez-Garcia*, 473 F.3d at 21; *see also Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001) (stating that the employer's burden to establish that "that legitimate reasons, standing alone, would have induced the employer to take the same adverse action" applies to both "dual motive" and "pretext" cases).

      As *Velazquez-Garcia* explains, "[t]his two-pronged burden-shifting analysis is markedly different from the three-pronged burden-shifting analysis in Title VII actions [where] the burden of persuasion . . . always remains with the employee." 473 F.3d at 17. In comparison to the Title VII burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)), "under USERRA, the employee does not have the burden of demonstrating that the employer's stated reason is a pretext. Instead, the employer must show, by a preponderance of the evidence, that the stated reason was not a pretext; that is, that 'the action *would* have been taken in the absence of [the employee's military] service.'" *Id.* (quoting 38 U.S.C. § 4311(c)); *see also McKenna v. City of Phil.*,

649 F.3d 171, 178 n.7 (3d Cir. 2011) (explaining similarities between Title VII and USERRA). Thus, "[u]nlike the *McDonnell Douglas* framework [utilized in Title VII claims], the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer." *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005) (quotations and citations omitted, alterations in original).

Turning to this action, the court finds that even if Plaintiff can establish that his military status was a motivating factor in Defendant's termination decision, Defendant has established as a matter of law that it would have terminated Plaintiff without regard to Plaintiff's protected status. *See Wallace*, 479 F.3d at 625. Specifically, Defendant asserts that it terminated Plaintiff for violating its workplace violence policy when he became involved in a violent altercation with Wehner on August 2, 2010. And the uncontroverted evidence, when viewed in a light most favorable to Plaintiff, establishes that Defendant's investigation into the August 2, 2010 incident supports only one conclusion -- that Plaintiff was the aggressor, that his violence injured Wehner, and that the violence was not justified. As a result, there is no genuine issue of material fact that Defendant would have terminated Plaintiff even if he had not been a member of the military.

Plaintiff does not dispute, given the events of August 2, 2010, that an investigation was warranted. Indeed, Defendant informed Plaintiff that its "employee handbook requires us to investigate all reports of workplace violence that involve [Defendant's] employees." Doc. No. 54-12, Def.'s Ex. 17. Defendant informed Plaintiff that its investigation into the August 2, 2010 incident would necessarily include "a complete review of any documentation related to the evidence, and interviewing individuals, including all employees who witnessed or were involved with it." *Id.* And there is no question that Defendant did exactly that. Defendant: (1) reviewed the police summary of the incident; (2) interviewed and obtained a written statement from Mata; (3) interviewed Christopherson; (4) gave Plaintiff the opportunity to tell his side of the story, present evidence, and direct Defendant to additional witnesses, and (5) reviewed Plaintiff's videotape of the August 2, 2010 incident. *See, e.g.*, Doc. No. 54-22, Def.'s Ex. 19 (memorandum of investigation).

This evidence collected leads to only one conclusion -- Plaintiff was the violent aggressor without justification. For example, the police report outlines statements by Wehner, Christopherson, and Mata (Diano and Plaintiff declined to make statements to the police). Doc. No. 54-26, Def.'s Ex. 14. Wehner told police that when she confronted Diano about taking Wehner's personal folder and took it

22

from Diano, Plaintiff "grabbed her by both arms and tackled her to the ground," trying to get the folder out of her hand. *Id.* at 244. Wehner further reported that when she managed to get up again, Plaintiff tackled her for a second time. *Id.* Christopherson reported that Plaintiff got in between Diano and Wehner, "put his shoulder" into Wehner, and "wrestled the folder from [Wehner] and pushed her on the floor." *Id.* at 246. Mata reported that while she was at Defendant's office, she heard yelling and banging and then saw Plaintiff grab Wehner and push her twice into a file cabinet. *Id.* The police report further documents Wehner's injuries (including a photograph of the bruising on Wehner's side), and states that Plaintiff was arrested for assault in the third degree.

The witness statements Defendant collected are consistent with the police report's determination that Plaintiff unlawfully used force against Wehner. In his telephone interview, Christopherson told Defendant's General Manager Shaen Tarter and Defendant's legal counsel that once Diano and Wehner started struggling over a file, Plaintiff "bull rushed" Wehner like a "football player" and "slammed" her into the file cabinets while Diano, Christopherson, and another man attempted to stop him. Doc. No. 54-22, Def.'s Ex. 19 at 3. Plaintiff then went to his vehicle and came back into the office to rush into Wehner a second time. *Id.* at 4. In her written statement and interview with Tarter and legal counsel, Mata told

23

Defendant that she witnessed the incident from Defendant's office and saw Wehner crouched next to a file cabinet while Plaintiff thrusted his arm repeatedly under her stomach and Diano and Christopherson yelled for Plaintiff to stop. *Id.* at 2; Doc. No. 54-19, Def.'s Ex. 12.

Defendant recognized that Mata and Christopherson's statements were inconsistent as to whether Plaintiff punched, as opposed to "bull rushed," Wehner. Defendant nonetheless reasoned that this difference "may be explained by [Plaintiff] attempting to grab the file." Doc. No. 54-22, Def.'s Ex. 19 at 4. And this difference does not detract from the fact that both Mata's and Christopherson's accounts clearly assert that Plaintiff was the aggressor. In other words, regardless of precisely *how* Plaintiff attacked Wehner, the only two witnesses not involved in the altercation reported that Plaintiff was the aggressor, that he injured Wehner, and that this violence had no justification.

Defendant invited Plaintiff to explain his side of the incident, yet he declined. Instead, Plaintiff's attorney asserted that Plaintiff's videotape of the incident clearly showed that Wehner was the aggressor. Defendant therefore viewed the videotape (which the court did as well) and the videotape shows (1) Diano collect files from a desk at Airventures; (2) Wehner confront Diano about taking Wehner's personal file and attempt to grab the files; and

(3) Plaintiff order Wehner not to touch Diano and then insert himself into the

struggle between the two women.  At this point, the videotape stops recording and

does not resume until Plaintiff and Diano are already leaving AirVentures.

Contrary to the assertions by Plaintiff's attorney as to what he

believes the videotape shows,[7] Defendant correctly explained that the videotape

"does not address the critical issues of whether or to what extent [Plaintiff] acted

violently."  Doc. No. 54-22, Def.'s Ex. 19 at 2.  Indeed, the videotape leaves

completely unanswered how long the struggle ensued, how Wehner fell and/or

obtained her injuries, and whether Plaintiff used unjustified force against Wehner.

Plaintiff (and/or his attorney) was given the opportunity to explain these issues, yet

declined to do so.  Thus, the videotape and Plaintiff's generalized assertions

provide no insight into whether Plaintiff violated Defendant's workplace violence

policy and do not call into question the witness statements and police reports

indicating that Plaintiff was the aggressor.  In other words, the videotape did not

---

[7] In his Opposition, Plaintiff made these same assertions that the videotape makes
"apparent that Wehner was the aggressor."  *See* Doc. No. 64-2, Pl.'s Decl. ¶ 3.  The court has
reviewed the videotape and as explained below, the videotape does not depict the actual
altercation and fails to establish who the aggressor was as between Wehner and Plaintiff and/or
whether Plaintiff's actions were unjustified.  The court therefore need not accept Plaintiff's
assertions for purposes of determining whether there is any genuine issue of material fact that
Defendant terminated Plaintiff due to his military status.  *See Scott v. Harris*, 550 U.S. 372, 380
(2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted
by [a videotape], so that no reasonable jury could believe it, a court should not adopt that version
of the facts for purposes of ruling on a motion for summary judgment.").

exculpate Plaintiff, much less even call into question Mata's and Christopherson's assertions that Plaintiff was the aggressor. Instead, the videotape depicted events only prior to and after the actual altercation.

That Defendant's investigation left no doubt that Plaintiff should be terminated for violating the workplace violence policy is confirmed by Plaintiff's own admissions in this action. In response to Defendant's Concise Statement of Facts ("CSF"), Plaintiff admitted that (1) he had a violent altercation with Wehner, resulting in injuries to Wehner, Doc. No. 54, Def.'s CSF ¶ 17; (2) Defendant invited Plaintiff to tell his side of the story, *id.* ¶ 21; (3) both Mata and Christopherson reported to Defendant that Plaintiff used force against Wehner and Defendant addressed the inconsistency between their versions, *id.* ¶¶ 24-26; and (4) based on the evidence collected, Defendant concluded that credible evidence established that Plaintiff was the aggressor, that he acted violently, and that his violence was not justified. *Id.* ¶ 27.[8] In other words, Plaintiff admits that the evidence Defendant had before it established that Plaintiff was the aggressor and termination was proper.

---

[8] Pursuant to Local Rule 56.1(g), material facts set forth in a moving party's concise statement of facts are deemed admitted unless controverted by a separate concise statement of facts by the opposition party. *See also United States v. Hernandez*, 251 F.3d 1247, 1251 (9th Cir. 2001) (explaining that local rules promulgated by the district courts are "laws of the United States" (quoting *United States v. Hvass*, 355 U.S. 570, 575 (1958)). In his CSF, Plaintiff specifically admitted that the facts recited above were undisputed.

In sum, the evidence Defendant collected supports only one conclusion -- that Plaintiff was the clear aggressor, that he acted violently, that he injured Wehner, and that his violence was not justified. Stated differently, based on the evidence collected by Defendant, there was *no* evidence to suggest that Plaintiff was not the aggressor. And there is no suggestion -- by Plaintiff or based on the record before the court -- that Defendant's investigation was anything but thorough. Nor is there any evidence that Defendant's decision to terminate Plaintiff was inappropriate discipline in light of the violation. Indeed, Plaintiff admitted that workplace violence was a cause for termination and that he described the area where the altercation occurred as the "workplace." Def.'s CSF ¶¶ 21, 29. Thus, there is no evidence that Defendant "did not honestly believe its proffered reasons" for terminating Plaintiff and/or terminated Plaintiff because of Plaintiff's military service. *See Escher v. BWXT Y-12, L.L.C.*, 2009 WL 2366464, at *16 (E.D. Tenn. July 30, 2009) (stating that for USERRA claim, "[i]n determining pretext, the question is whether the employer defendant honestly believed its reason for the adverse employment action" (quotations omitted)); *see, e.g.*, *Stadtmiller v. UPMC Health Plan, Inc*., 799 F. Supp. 2d 492, 517 (W.D. Pa. 2011) (granting summary judgment on USERRA claim where a reasonable jury "could only conclude that [the plaintiff's unsatisfactory job performance], rather than his

uniformed service, brought about his termination"); *Rivera-Cartagena v. Wal-Mart Puerto Rico, Inc.*, 802 F. Supp. 2d 324, 347 (D. P.R. 2011) (granting summary judgment on USERRA claim where it was "evident that Rivera's dismissal was due to his violation of Wal-Mart's strict Alcohol and Drug Abuse Policy; it was therefore inevitable and would have taken place regardless of his military status and obligations"); *Clune v. Desmond's Formal Wear, Inc.*, 2003 WL 21796388, at *8 (N.D. Ind. Feb. 4, 2003) (granting summary judgment on USERRA claim where it was undisputed that the ultimate decision to terminate the plaintiff was due to a confrontation he had with a co-worker and there was no evidence in the record suggesting that the employer did not honestly believe that the plaintiff engaged in behavior warranting termination); *cf. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (stating in Title VII case that there was no inference of discrimination where "[the plaintiff] presented no evidence that [defendant] did not honestly believe its proffered reasons").

   In finding that Defendant has established as an uncontroverted fact that it would have terminated Plaintiff's employment even if he had not been a member of the military, the court recognizes that Plaintiff has put forth evidence of an August 12, 2009 incident which arguably suggests that Defendant previously disciplined Plaintiff as a result of his military status. Specifically, on August 12,

2009, Plaintiff received a written warning for (1) failing to use a Status Change

Form to request days off, (2) impacting scheduling by requesting two extra days

off to recover from jetlag, and (3) failing to corroborate his request for days off

with military orders and/or his commanding officer's contact information.

According to Plaintiff, he provided a Status Change Form to his immediate

supervisor Reis on August 4, 2009, and could not provide it earlier because he had

not received his military orders.  Doc. No. 64-16, Pl.'s Ex. 13.  Further, Plaintiff's

request for additional days off to recover from jetlag did not impact scheduling

where another employee had switched days with him and Reis approved the

change.  *Id.*  Plaintiff agreed, however, to provide his military supervisor's contact

information and documentation of military orders.

    Viewed in a light most favorable to Plaintiff, a reasonable jury could

potentially draw the inference that Plaintiff's military service was at least one

reason (among other legitimate reasons) why Defendant issued the August 12,

2009 warning.  Yet this August 12, 2009 warning does not undermine the court's

conclusion that Defendant would have terminated Plaintiff as a result of the August

2, 2010 incident regardless of Plaintiff's military status.  This warning is the *only*

evidence suggesting any military animus and is wholly separate in degree and

content from the August 2, 2010 incident and resulting termination.  *Cf.*

*Rademacher*, 645 F.3d at 1011 (affirming that plaintiff failed to present sufficient evidence of military animus in termination decision where the only evidence was the employer's initial expressed frustration at plaintiff's enlistment); *Schribner v. Worldcom, Inc.*, 249 F.3d 902, 907 (9th Cir. 2001) ("While we must view the evidence in the light most favorable to the non-moving party, a mere scintilla of evidence or some metaphysical doubt as to material facts will not suffice[.]") (internal quotations omitted).  And this August 12, 2009 warning does not call into question that (1) Defendant carried out a proper investigation into the August 2, 2010 incident, (2) the evidence -- viewed in the light most favorable to Plaintiff -- unequivocally supported that Plaintiff violated the workplace violence policy, and (3) termination was appropriate in light of Defendant's findings.  Thus, the August 12, 2009 incident fails to raise a genuine issue of material fact that Defendant would have terminated Plaintiff but for his military service.

Finally, the only other evidence that could potentially call into question whether Defendant used the August 2, 2010 incident as pretext to terminate Plaintiff is that Wehner testified at an August 23, 2010 Hawaii state court TRO hearing that Mata told her that Plaintiff "is not getting accepted back" at work.  *See* Doc. No. 64, Pl.'s Resp. to Def.'s CSF ¶ 32; Pl.'s Ex. 24 at 32-33.  If Defendant decided to terminate Plaintiff before conducting its investigation, then

such fact would certainly suggest that Defendant did not terminate Plaintiff for violating the workplace policy. Yet Wehner's testimony about what Mata told her does not support this proposition for several reasons.

As an initial matter, Mata's statement is inadmissible hearsay because Plaintiff submits Mata's statement (as recited by Wehner) for the truth of the matter asserted -- *i.e.*, that Defendant had already decided that it would not allow Plaintiff back at work. Plaintiff, the proponent of this statement, has failed to offer any possible hearsay exception to this statement (or under Rule 801(d)(2), that it is non-hearsay). Although Mata is an office supervisor, Plaintiff offers no evidence addressing whether Mata was authorized to make such statement and/or made such statement as an agent of Defendant.[9] *See* Fed. R. Civ. P. 801(d)(2); *United States v. Bonds*, 608 F.3d 495, 502 (9th Cir. 2010) (explaining that a non-hearsay

---

[9] The court recognizes that *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003), provides that "at the summary judgment stage, we do not focus on the admissibility of the evidence's form. We focus instead on the admissibility of its contents." *See also Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."). *Fraser* affirmed consideration of hearsay contained in the plaintiff's diary on summary judgment because at trial, the plaintiff's testimony of its contents would not be hearsay -- the plaintiff could testify to the portions of the diary from her personal knowledge, Fed. R. Evid. 602, use the diary to refresh her recollection, Fed. R. Evid. 612, or even read the diary into evidence as a recorded recollection, Fed. R. Evid. 803(5). *Fraser*, 342 F.3d at 1037. In comparison, Plaintiff has provided no basis to admit Mata's statement at trial. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778-79 (9th Cir. 2002) (holding that deposition testimony in which the witness testified that an FDIC employee told him that Bank of America had submitted negative documents about the plaintiff to the FDIC, when offered to prove that Bank of America had in fact submitted such documents, was inadmissible hearsay that could not be considered on summary judgment).

statement under Federal Rule of Evidence 801(d)(2)(c) "requires the declarant to have specific authority from a party to make a statement concerning a particular subject" and a non-hearsay statement under Rule 801(d)(2)(D) "authorizes admission of any statement against a party, but only provided it is made within the scope of an employment or agency relationship"); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (holding that the proponent of hearsay must prove exception or exemption by preponderance of the evidence).  And in any event, Wehner's testimony regarding what Mata told her was struck from the record at the TRO hearing at Plaintiff's counsel's request as hearsay, Pl.'s Ex. 24 at 33, and it is therefore not evidence.

Further, Mata's statement, on its face, is so conclusory that it does not create a genuine issue of material fact on pretext -- "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  *Soremekun*, 509 F.3d at 984; *see also Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).  Indeed, the entire circumstances of when and how Mata allegedly made this statement to Wehner are wholly vague and conclusory such that the court cannot conclude what Mata meant

by this statement, if she made it at all. For instance, when and in what context did Mata make this statement? What was the basis of Mata's belief that Plaintiff would not be accepted back? At the time Mata made this statement, had Plaintiff even reapplied for his position with Defendant (Plaintiff applied for reinstatement August 20, 2010 and the TRO hearing occurred on August 23, 2010)? Without any explanation concerning the context of this statement, Mata could simply be asserting an assumption based on the fact that she witnessed the August 2, 2010 incident and believed that Plaintiff repeatedly punched Wehner. Thus, Mata's hearsay statements do not create a genuine issue of material fact that Defendant termination of Plaintiff based on the August 2, 2010 incident was pretext.

In sum, the undisputed evidence establishes that Defendant terminated Plaintiff because of the August 2, 2010 altercation and investigation, and Defendant would have terminated Plaintiff regardless of his military status. The court therefore GRANTS Defendant's Motion for Summary Judgment on Plaintiff's claim for violation of 38 U.S.C. § 4311.

### 2. *38 U.S.C. § 4312*

Beyond the anti-discrimination provisions of § 4311, "USERRA provides that, subject to certain conditions, 'any person whose absence from a position of employment is necessitated by reason of service in the uniformed

services shall be entitled to the reemployment rights' under USERRA." *Leisek*, 278 F.3d at 900-01 (quoting 38 U.S.C. § 4312(a)). Specifically, "[s]ection 4312 of USERRA provides a right to reemployment for members of the armed services who (1) properly notify their employers of the need for a service-related absence, (2) take cumulative absence of no more than five years, and (3) properly report to work or reapply for employment, depending upon the length of the absence."[10] *Wallace*, 479 F.3d at 625.

Section 4312 is limited to reemployment rights only -- it "protects

---

[10] 38 U.S.C. § 4312(a) provides:

Subject to subsections (b), (c), and (d) and to section 4304, any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter if--

(1) the person (or an appropriate officer of the uniformed service in which such service is performed) has given advance written or verbal notice of such service to such person's employer;

(2) the cumulative length of the absence and of all previous absences from a position of employment with that employer by reason of service in the uniformed services does not exceed five years; and

(3) except as provided in subsection (f), the person reports to, or submits an application for reemployment to, such employer in accordance with the provisions of subsection (e).

service members at the instant of seeking reemployment, entitling the service member to reemployment in either the position she would have been in had she not left for military service 'or a position of like seniority, status and pay, the duties of which the person is qualified to perform.'" *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 930 (8th Cir. 2007) (quoting 38 U.S.C. § 4313(a)(2)(A), which defines the rights set forth in § 4312). Once a service member is reemployed, § 4312 no longer applies and the other provisions of USERRA -- such as § 4311 -- provide protections to service members. *Id.* (citing *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir. 2006) (noting that § 4312 protects military members up to the instant of reemployment while other sections of USERRA, such as § 4311 and § 4316, protect the member after reemployment occurs)). In other words, "§ 4312 'only entitles a service person to immediate reemployment and does not prevent the employer from terminating him the next day or even later the same day.'" *Francis*, 452 F.3d at 304 (quoting *Jordan v. Air Prods. & Chems., Inc.*, 225 F. Supp. 2d 1206, 1208 (C.D. Cal. 2002)).

There is no genuine issue of material fact that Defendant reinstated Plaintiff to his former position (yet placed him on paid administrative leave pending investigation into the altercation). *See* Doc. No. 54, Def.'s CSF ¶ 20. And Plaintiff does not argue -- and there is no evidence -- that Plaintiff's placement into

his former position somehow violated § 4312.  The court therefore GRANTS

Defendant's Motion for Summary Judgment on Plaintiff's USERRA claim

pursuant to § 4312.

## B.    Title VII

Plaintiff asserts that "Defendant's termination of Plaintiff on January

18, 2011 was motivated by race, national origin and retaliation in violation of 42

U.S.C. § 2000e-1 et seq. . . . ."  Am. Comp. ¶ 18.  The court addresses Plaintiff's

claims of discrimination and retaliation in turn.

### *1.    Discrimination*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides a

"useful tool [ ] at the summary judgment stage" in addressing Title VII claims.  *See*

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).  Under this

framework, Plaintiff has the initial burden to establish a *prima facie* case of

discrimination.  *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009)

(citation and quotation omitted).  A *prima facie* case under *McDonnell Douglas*

requires Plaintiff to offer proof that: (1) he belongs to a protected class; (2) he

performed his job adequately or satisfactorily; (3) he suffered an adverse

employment action such as termination, demotion, etc.; and (4) other similarly

situated employees who do not belong to the same protected class were treated

differently.[11] *McDonnell Douglas*, 411 U.S. at 802; *see Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *Noyes v. Kelly Servs*., 488 F.3d 1163, 1168 (9th Cir. 2007).

"The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted). If Plaintiff puts forth his *prima facie* claim, the burden then shifts to Defendant to put forward a legitimate, non-discriminatory reason for its actions. If Defendant proffers such a reason, the burden shifts back to Plaintiff to show that Defendant's reason is actually a pretext for discrimination. *Boeing Co.*, 577 F.3d at 1049 (citation and quotation omitted).

"[A] plaintiff's burden is much less at the prima facie stage than at the

---

[11]    Despite this "useful tool" of the *McDonnell Douglas* framework, there is nothing that "compels the parties to invoke the *McDonnell Douglas* presumption." *McGinest*, 360 F.3d at 1122. "When responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest*, 360 F.3d at 1122). If the plaintiff submits direct or circumstantial evidence, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id*. (quoting *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir. 1998)). Because Plaintiff proffered no direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated Defendant's termination decision and the parties agreed at the April 23, 2012 hearing that this is the appropriate framework, the court applies the *McDonnell Douglas* framework.

pretext stage." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010). That is, circumstantial evidence of pretext must be specific and substantial, *see Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1163 (9th Cir. 2009), and a plaintiff must do more than merely deny the credibility of the defendant's proffered reason. *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986). "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003); *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory [or retaliatory] statements or actions by the employer." *Coghlan*, 349 F.3d at 1095. Circumstantial evidence requires an additional inferential step to demonstrate discrimination. *Id.*

Defendant's argument on Plaintiff's Title VII claim largely mirrors its argument on Plaintiff's USERRA claim -- that even if Plaintiff can establish a prima facie case of discrimination, there is no genuine issue of material fact that Defendant terminated Plaintiff for violating the workplace violence policy. That is, Defendant argues that it has provided a legitimate, non-discriminatory reason for Plaintiff's termination and Plaintiff has not shown the reason to be pretextual.

As explained above, USERRA places a heavier burden on Defendant to establish that its reasons for terminating Plaintiff were not pretext, whereas Title VII places the burden on Plaintiff to establish pretext. *See Velazquez-Garcia*, 473 F.3d at 17. Given that the court finds that Defendant met his burden on Plaintiff's USERRA claim of establishing no genuine issue of material fact suggesting that Plaintiff's termination due to the August 2, 2010 incident was pretext, Plaintiff's Title VII claim similarly fails. As explained above, there is no evidence on the record from which a reasonable jury could conclude that Defendant terminated Plaintiff for reasons other than the August 2, 2010 incident. Given this complete lack of evidence, the court's conclusion that there is no evidence of pretext does not change whether Plaintiff or Defendant has the burden on this element.

Thus, the court finds that for Plaintiff's Title VII discrimination claim, Defendant has carried its burden of putting forward a legitimate, non-discriminatory reason for terminating Plaintiff (violating the workplace violence policy), and in response, Plaintiff has failed to establish a genuine issue of material fact that this reason is pretext. The court therefore GRANTS Defendant's Motion for Summary Judgment on Plaintiff's Title VII discrimination claim.

**2.    *Retaliation***

Under Title VII, an employer may not discriminate against an

employee because the employee has opposed an employment practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

To make a *prima facie* showing of retaliation, Plaintiff must show that (1) he engaged in a protected activity; (2) Defendant took an adverse action against him; and (3) there was a causal link between his involvement in the protected activity and the adverse personnel action undertaken by Defendant.  *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *McGinest*, 360 F.3d at 1124.  The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's retaliation claim.  *See McGinest*, 360 F.3d at 1124.

Applying this framework, even if Plaintiff could establish some causal

link between his protected activity and termination, as explained above, Defendant set forth a legitimate, non-discriminatory reason for his termination -- the August 2, 2010 incident and Defendant's subsequent investigation finding that Plaintiff used force without justification and otherwise refused to assist in the investigation. And, as with the claims analyzed above, there is simply no evidence of pretext. The court therefore GRANTS Defendant's Motion for Summary Judgment on Plaintiff's Title VII retaliation claim.

## C.    HRS § 378-2

Like Title VII, HRS § 378-2 makes it an unlawful discriminatory practice for any employer (1) "to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of race, HRS § 378-2(a)(1)(A), or (2) "to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part." HRS § 378-2(a)(2). The court applies the Title VII burden-shifting framework to Plaintiff's discrimination and retaliation claims under HRS § 378-2. *See Schefke v. Reliable Collection Agency, Ltd.*, 96 Haw. 408, 426, 32 P.3d 52, 70 (2001); *Sam Teague, Ltd. v. Haw. Civil Rights Comm'n*, 89 Haw. 269, 971 P.2d 1104, 1114 n.10 (1999). As a result, for all the same reasons explained above as to Plaintiff's Title VII claims, Plaintiff's § 378-2 claims fail as well -- Defendant

carried its burden of putting forward a legitimate, non-discriminatory reason for terminating Plaintiff (violating the workplace violence policy), and in response, Plaintiff has failed to establish a genuine issue of material fact that this reason is pretext. *See, e.g.*, *Turner v. Dep't of Educ. Hawaii*, --- F. Supp. 2d ----, 2012 WL 668829, at *18 (D. Haw. Feb, 29, 2012) (summarily dismissing § 378-2 claims for same reasons as Title VII claims).

The court therefore GRANTS Defendant's Motion for Summary Judgment on Plaintiffs claim pursuant to HRS § 378-2.

## D.   HWPA

Remaining is Plaintiff's claim for violation of the HWPA, HRS § 378-61 et seq.

Defendant argues, among other things, that the court lacks jurisdiction over this claim because there is no common nucleus of operative facts between this claim and the federal claims.  The court finds that it ultimately need not reach this argument -- given the court's dismissal of the federal claims, this remaining claim is a state law claim over which the court has at most only supplemental jurisdiction (there is no basis for diversity jurisdiction given that both Plaintiff and Defendant are citizens of Hawaii).  Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all

claims over which it has original jurisdiction [.]" "[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc).

Because state courts have the primary responsibility for developing and applying state law, the "values of judicial economy, convenience, fairness and comity" do not favor retaining jurisdiction in this case. *See Acri*, 114 F.3d at 1001 (providing that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will . . . point toward declining to exercise jurisdiction over the remaining state-law claims" (quoting *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7)). The court therefore declines to continue exercising supplemental jurisdiction over Plaintiff's remaining state law claim.[12]

*///*

---

[12]  28 U.S.C. § 1367(d) provides that "[t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

# V.  <u>CONCLUSION</u>

Based on the above, the court GRANTS in part Defendants' Motion for Summary Judgment as to Plaintiff's claims for violations of USERRA, Title VII, and HRS § 378-2.  There being no other federal claims and no other basis for federal jurisdiction, the court declines to assert supplemental jurisdiction over the remaining state law claim.  The state law claims are dismissed without prejudice. The Clerk of Court is directed to close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 3, 2012.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Coyaso v. Bradley Pac. Aviation, Inc.*, Civ. No. 11-00267 JMS/RLP, Order Granting in Part Defendant's Motion for Summary Judgment

44